Bob MOSLEY *v.* G. M. McDAVID et ux

5-5565                                            466 S. W. 2d 922

Opinion delivered May 17, 1971

*Don Gillaspie,* for appellant.

*J. G. Ragsdale,* for appellees.

J. FRED JONES, Justice. This is an appeal by Bob Mosley from an order decreed by the Union County Chancery Court restraining him from constructing a proposed building on property he leased from G. M. McDavid and wife; and requiring Mosley to restore a metal canopy which he had removed in preparation for the erection of the proposed building.

On the 16th day of October, 1969, Mr. and Mrs. McDavid entered into a written lease agreement with Mosley under which they let to Mosley a plot of ground approximately 80 x 200 feet for a term of five years beginning on November 1, 1969, with option of renewal for two additional five year terms. This lease contained the following paragraphs:

"4. Lessee has the right, at his sole cost and expense, to erect a building on the above described property for his use as an office. At the expiration of this lease, or any renewal thereof, Lessee shall have the right to remove said building from the premises described in this lease.

5. Lessee agrees that at the expiration of the primary term of this lease, or any extension or renewal thereof, he will return to Lessor the land and the building now located thereon, which is the subject of this lease, in as good condition as it now is, the usual wear and tear excepted.

Lessee agrees that he will not commit waste, nor permit waste to be done to or upon the aforesaid property or premises; that he will not conduct nor permit to be conducted any beer or liquor business thereon; that he will not permit the sale or repair of televisions or household appliances thereon, nor will Lessee operate or permit to be operated or to be located thereon any structure or activity which will constitute a public nuisance; that he will keep said property and the premises about the same in a clean, orderly and sanitary condition; that he will not permit trash or debris of any nature to collect or accumulate in and about said premises, and will,

at all times, keep the same in an orderly manner. The parties hereto further mutually agree that Lessee shall not have the right to sublet the premises or any portion thereof at any time to any third party without the consent of Lessor. Lessor agrees that his consent to subletting will not be unreasonably withheld; provided, however, that such assignment or subletting shall not in any way relieve Lessee of any responsibility or liability pursuant to the terms of this agreement."

Prior to the lease, McDavid had used the premises in connection with a Buick automobile agency, and a metal building, now under lease to other parties, had been constructed on one corner of the lot adjacent to that portion leased to Mosley. The area leased to Mosley was surfaced with asphalt and had a metal canopy, or carport, constructed on galvanized steel posts set in concrete beneath the asphalt surface. The canopy had been built and previously used in connection with the Buick agency. It was approximately 20 feet wide and extended approximately 80 feet along the front, then approximately 40 feet into the depth of the leased property. The canopy was the only structure erected on the area leased to Mosley and constituted "the building now located thereon" as referred to in paragraph five of the lease.

Mosley was in the used automobile business when the lease was entered into. He subsequently acquired a franchise, or dealership, for new Toyota automobiles and under his franchise agreement, he was required to provide a 20 x 45 foot showroom with a glass front for the display of new Toyota automobiles. Mosley advised McDavid of the franchise and the building requirements, and he sought McDavid's permission to erect the required building on the leased premises. McDavid advised Mosley that he did not want a permanent structure of this nature built on the leased premises. Relying on paragraph four of his lease, Mosley proceeded oward the construction of a steel building to be supported on eight concrete piers two feet square and sunk 16 inches into the ground. The floor of the building was to be

a concrete slab four inches thick, 20 feet wide and 45 feet long, and was to be poured on top of the asphalt surface of the lot.

In order to erect the building on the leased area in the position he wanted it, Mosley found it necessary to remove approximately 40 feet of the metal canopy. He accomplished this by cutting the steel posts at their base with an acetylene torch, and he had removed this portion of the canopy to the rear of the leased premises when Mr. McDavid stopped the work by a temporary restraining order and filed his petition to make it permanent. In his answer to the petition for a restraining order, Mr. Mosley alleged that the building he proposed to construct was for use as an office building as permitted in his lease agreement, and that he had been damaged because of delay in construction by reason of the temporary restraining order. He prayed judgment against McDavid for $1,500. McDavid countered by an allegation of waste committed in connection with removal of the canopy and prayed judgment for $2,500.

After reciting his findings as above set out, the chancellor found that the cutting of the posts and removal of the decking and beams supporting the canopy constituted waste, and that Mosley should be permanently enjoined from building the office, showroom and salesroom, on that portion of the lot where the canopy had been removed, and that he should be ordered to replace the canopy and to restore the premises to the condition they were in prior to the removal of the canopy. The chancellor further found that a small portable building which Mosley had placed on the lot, and had been using as an office, did not amount to erection of an office building as contemplated in the lease, and that Mosley, under the lease, had a right to erect a building for an office. The chancellor then decreed, in part, as follows:

"Defendant is hereby permanently enjoined from constructing the building as depicted by Exhibits 2, 3 and 4 on the leased premises, defendant shall restore the property to the same condition it was prior

to the removal of the canopy, that defendant has the right under the lease to erect a building on the property for use as an office, defendant shall pay all costs."

On appeal to this court Mosley seeks reversal on the following point:

"The order and findings of the chancellor are contrary to the preponderance of the evidence and to the law."

Simple contract law is the only law involved in this case. The chancellor's duty was to determine the rights of the parties under the terms of their agreement and while we try cases de novo on appeals from chancery, it is our duty and practice to affirm the chancellor's decree if it is not against the preponderance of the evidence.

Mr. McDavid contends that Mosley leased the premises for a used car lot and was only entitled to erect a small office on the premises, such as is usually found on used car lots. It is his contention that the parties contemplated such office building that could be erected and removed without damage to the leasehold.

It is Mosley's contention that the parties contemplated such office building as he might desire and find necessary in connection with any unrestricted business he might desire to conduct on the lot, so long as he surrendered the property at the end of the lease term in as good condition as when the lease agreement was entered into. Mosley contends that a showroom is included within the dictionary definition of "office" and as generally used in connection with an automobile agency.

Mr. McDavid supported his contention with evidence to the effect that Mosley was in the used car business when the lease was entered into and it was within the contemplation of the parties that the office referred to in the lease was to be a small office to be used in connection with the used car business; that the canopy

permanently constructed on the premises was intended to remain as it was and available to Mosley in connection with his used car business. McDavid also submitted evidence to the effect that he had gone to considerable expense in paving the entire leased lot with asphalt; that he had considerable difficulty with underground water seepage and had gone to considerable expense in sealing the asphalt against water seepage from the ground underneath the asphalt; that the erection of the proposed building would disturb the seal placed on the asphalt and would result in additional damage from seepage. He also produced evidence tending to show that the metal canopy could not be removed and replaced in its original place and condition.

The evidence submitted by Mosley tended to show that the canopy could be replaced at the termination of the lease in as good condition as it was prior to removal; that the concrete slab for the building could be broken up and removed without damage to the asphalt surface; that the piers on which the building was to rest could be removed from the asphalt surface and ground; that the holes could be filled and the surface repaired in as good condition as at the time of the lease. He contended that the building he proposed to construct only constituted an "office building" within the meaning of the automobile industry and within the meaning and terms of the lease agreement. He offered some evidence tending to prove that in the automobile industry a showroom and office are synonymous terms.

Mr. McDavid testified, in part, as follows:

". . . some time prior to October 16, the date of the lease, Mr. Mosley came to me and talked to me about renting that part of the lot, 80 by 220, and I told him I was looking for a renter and he said he wanted to, he was in the used car business with his brother or on the same lot and he wanted to get a lot to handle his used cars and so after some conversation we agreed on the lease."

Mr. McDavid testified that there had originally been a spring branch through the property and that he had

previously had considerable trouble with potholes forming in the blacktop paving because of water coming up from the ground; that to eliminate this situation he had spent upward of $9,000 for new asphalt paving and about $3,000 for additional sealer to keep water from breaking up through the pavement. He says that the carport or awning consisted of metal beams on galvanized metal posts and covered with sheets of metal extending 80 feet across the front of the property with a wing extending back approximately 40 feet into the lot. Then Mr. McDavid continued:

> "Mr. Mosley . . . told me . . . 'I am talking about taking a franchise for a car and I need a showroom,' and he said, 'What I planned is to show the cars under this carport.' I said, 'Now, Mr. Mosley, I don't want that carport bothered because it's a permanent structure and when you dig it out of the ground you're going to have some trouble with water seepage.' He said, 'I will assure you we won't do that, we will put this glass in there and won't take up any of the posts, just frame in that part of the carport with glass.' I said, 'Well, that sounds like a funny construction but you go ahead with it but you are not to tear any of the carport nor the surface of the lot."

Questions by the chancellor were answered by Mr. McDavid as follows:

> "Q. Mr. McDavid, if I understood your testimony that you prepared the lease and then the Defendant came back and wanted permission to build a building, was that then added to the lease?
>
> A. We rewrote the lease. I took that lease and destroyed it and wrote a new lease and added in a building in there and to me a building means one building.
>
> Q. Did you all have any discussion as to what type of building he wanted and what it was to be used for?

A. Yes, sir, an office building only.

Q. What type office building?

A. He said he wanted it large enough where he could have a table and some chairs and his telephone and some filing cabinets.

Q. Now, does the lease specify for what purpose he was leasing it?

A. No, sir.

Q. Did you know the purpose he was leasing it for, although it wasn't put in the lease?

A. I think at the time it was leased he had no idea of anything except used cars. I think this Toyota building came up considerably later.

Q. At the time you leased it to him, the car-port, is that what you call the structure on the lot now?

A. Yes, sir.

Q. That was on there at the time he leased it?

A. Yes, sir.

Q. And had been there for a good many years?

A. Yes, sir.

Q. And was its primary purpose or why it was put there, what was the primary purpose?

A. Just to protect the cars in rainy weather and keep them out of the hot sun.

Q. Does it have any other purpose?

A. No, sir..."

Mr. Dan Shelton, a salesman for Ace Supply Company, testified that he was dealing with Mr. Mosely for the sale of the building which Mr. Mosley proposed to erect on the lot; that the building contemplated was a "20 by 45 steel building with a concrete foundation, showroom and office." He testified that the building was designed to be built on a four inch thick concrete slab to be laid on the asphalt surface of the lot, and that eight piers for the support of the building would be set on concrete pads two feet square and about 16 inches deep, going through the asphalt surface and into the ground.

Mr. Bob Mosley testified, in part, as follows:

> ". . . in October of 1969, I needed a lot to use for automobiles sales and I contacted Mr. McDavid about leasing this lot and we entered into an agreement.

Q. Did you have any general discussion about the use that was to be made of the property?

A. Yes, he leased the property for five years with two five year options and I told him that I would need to build me an office there to go with my business and I talked to him about that and I had Paul Jones come over and figure with me on building a concrete slab and brick building there where I later moved in a portable building. I had Mr. McDavid's approval to do that and I decided after talking to Paul Jones to buy a Jimmy Goad building and move it there temporarily until I decided I would go ahead with the other type building.

* * *

Q. Did he object to your building a building on the premises at that time?

A. No, the only thing he cautioned me about was this sealer that has been discussed, anywhere

I had to break the asphalt, to be sure to get it sealed back good.

Q. That is what Mr. McDavid told you?

A. That is the way we discussed it.

Q. I gather Paul Jones did not build a building for you at that time?

A. No.

Q. Why?

A. I bought a portable building and moved it in there.

Q. That portable building, you can move it from place to place?

A. Yes.

Q. Is it connected at all to the real estate?

A. No, it's on skids.

\* \* \*

Q. And when you first thought about this thing you told him you wanted it for a used car place of business?

A. That is what we discussed. I also told him I might use it for something else.

\* \* \*

A. . . . when I was talking to Toyota, I called Mr. McDavid and told him what I planned to do and that I would have to have a little showroom and I planned to enclose part of that canopy the same size of the building, in order to qualify for the Toyota franchise. I felt it

would be simpler to use the roof that was there, I had his full agreement on that. I had a builder come out and give me an estimate on doing this and the cost of doing this was too close to what a complete new building was. I decided to go ahead with a new building because the builder said the building wouldn't look near as nice because this canopy had a lower roof than the normal type they were building, so then I decided, in the meantime I had already signed up with Toyota, thinking we were going through with this thing under the canopy, and after the builder came out and pointed this out to me I called Mr. McDavid back and told him what I needed to do then."

Mr. Mosely testified that Mr. McDavid first prepared a lease which did not contain a provision for building an office, and that a second lease was prepared which did contain such provision and in this connection, under questions by the chancellor, Mr. Mosley testified as follows:

"Q. What business were you in then and why did you insist on a building?

A. I was in the automobile business and I had to have a building for an office.

Q. You were in the used car business and you don't have showrooms in that business?

A. Normally, no.

Q. And what was your intention at that time and Mr. McDavid's understanding of what kind of building you wanted to put on the property?

A. I originally planned to put a concrete slab and brick building on there.

Q. This was before the lease was signed or after?

A. Before.

Q. Did you all discuss as to where it would be located?

A. Yes, we discussed it would be located where my office building is now."

We are of the opinion that the chancellor's decree is not against the preponderance of the evidence and that it should be affirmed.

The decree is affirmed.